UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JESA ENTERPRISES LTD,

        Plaintiff,                      Case Number 16-10885

v.                                                  Honorable David M. Lawson

THERMOFLEX CORPORATION,

        Defendant,

and

THERMOFLEX CORPORATION,

        Third-Party Plaintiff,

v.

SILAGY MURDOCH GROUP, INC., SILAGY
MURDOCH GROUP LLC, and JESA
ENTERPRISES LTD,

        Third-Party Defendants.
_____/

**CORRECTED OPINION AND ORDER GRANTING IN PART AND DENYING IN
PART MOTIONS TO STRIKE TESTIMONY OF PROPOSED EXPERT WITNESSES**

        In this action by a manufacturer's representative for contract damages, including post-termination commissions, each side has filed motions challenging the admissibility of the other side's expert witnesses. Each side's expert intends to offer opinions (which, predictably, vary) on the custom and practice in the automotive industry for paying commissions to the representative for the life of the part sold to original equipment manufacturers. Two of the experts (one for each side) also intend to offer an opinion on who should prevail in this case. The respective reports (including a supplemental report from the plaintiff's expert) and deposition testimony show that the expert witnesses satisfy Evidence Rule 702 on their explanations of industry custom and practice.

However, neither side has furnished a sufficient basis to allow the witnesses to tell the jury whom they think should win. Therefore, the Court will grant the respective motions in part and deny them in part.

I.

Plaintiff Jesa Enterprises Ltd. acted as a sales representative for defendant Thermoflex Corporation by soliciting new customers to purchase the products Thermoflex manufactured — floor mats, bed liners, and the like — for use in cars and trucks. The parties agree that an oral agreement governed their relationship, but differ as to its terms. The central issue in this case is whether the plaintiff is entitled to post-termination commissions for the life of the parts on sales Jesa procured for Thermoflex before the parties terminated their relationship. Jesa listed Terrence A. Barr as a proposed expert witness to testify on the practices and customs in the automotive parts industry related to life-of-the-part agreements. Thermoflex disclosed two rebuttal expert witnesses, Donald E. Rose and Roger E. Rickey.

The plaintiff's proposed expert submitted a supplemental report in February 2017. The defendant filed a motion challenging the statements in that supplemental report, raising the same arguments put forth in the earlier motion. The Court heard oral argument on the first round of motions on May 16, 2017. But because the defendant's second motion raises similar arguments, and because the motion papers adequately set forth the relevant facts and law, oral argument will not aid in the disposition of that later motion. Therefore, it is **ORDERED** that the motion be decided on the papers submitted. *See* E.D. Mich. LR 7.1(f)(2).

A.

Barr currently runs the family manufacturer's representative business, which was started several years ago by his father. The business specializes in the automotive market, selling its clients' components, assemblies, and systems to automakers (OEMs) and their Tier I, II, and III suppliers. Barr has a bachelors degree in finance and a law degree. He practiced law with a firm in Detroit for five years, then went into his father's business as the director of marketing and administration in 1998, and has served as its president since 2000.

Barr submitted a report under Federal Rule of Civil Procedure 26(a)(2)(B) in which he gave a thorough explanation of life-of-the-part agreements in the automotive parts market. He wrote that parts manufacturers seeking business have the option to use an in-house sales force or contract with a third-party representative, like Jesa (or his company), depending on their tolerance for cost and risk. According to Barr, there is a long selling cycle inherent in the automotive parts market. He says it is not uncommon for sales representatives to work for one to three years before procuring a business award. And it may be another one to three years before a manufacturer starts production and delivery of the part, at which time the part producer gets paid and commissions become due. Sales representatives bear the risk of no business awards (and therefore no compensation) in exchange for commissions paid over the life of the part once production of the part commences years down the road. Manufacturers can avoid incurring the up-front costs of an in-house sales force by using an outside representative.

Barr's review of the facts of the case was limited to the first amended complaint and the defendant's answer. Drawing on these documents and his experience, he proposes to testify to these conclusions:

> In the present case, I have assumed an oral agreement for a commission between the parties and assumed no oral or written agreement specifically limiting commissions in a termination. I have also assumed that the Plaintiff's sales activity is within the automotive industry.
>
> It is well known and understood in the automotive industry as a practical matter that unless otherwise specifically agreed, "life of the part" is included in sales representative agreements, oral or otherwise.
>
> Based on the assumptions above, my experience and knowledge in the industry, and my review of the documents listed above, it is my opinion that Plaintiff is entitled to pre and post-termination commission for the life of the part on the business that he procured for Thermoflex prior to the date the agreement was terminated.

Def.'s Mot. [dkt. #61], Ex. A, Expert Report of Terrence A. Barr dated Oct. 31, 2016 at 5.

Barr furnished a supplemental report on February 27, 2017, which the defendant attacked in a later-filed motion, raising substantially the same arguments. In that supplemental report, Barr wrote:

> Post-termination engineering changes and post-termination activities performed by the principal do not alter the responsibility of the principal to pay life of the part commissions to the sales representative.
>
> [I]t is typically the expectation of the automotive supplier and the automotive customer that the part/product will be supplied for the requirements of the customer through the end of the life of any project(s)/program(s) that utilize such part/product.

Def.'s Mot. [dkt. #95], Ex. E, Supplemental Report of Terrence A. Barr dated Feb. 27, 2017 at 1.

Thermoflex did not quarrel with Barr's qualifications on the subject of industry custom and practice, at least not in its motion. It did challenge his qualifications in its reply brief. But arguments raised for the first time in a reply brief are not favored. *Balsley v. LFP, Inc.*, 691 F.3d 747, 773 (6th Cir. 2012) ("Issues raised for the first time in a reply brief are not properly before this court" (quoting *United States v. Perkins*, 994 F.2d 1184, 1191 (6th Cir. 1993))). Moreover, an expert witness may be "qualified . . . [by] experience . . . [to] testify in the form of an opinion or

otherwise," Fed. R. Evid. 702, and Barr is well qualified on that basis to offer testimony on the custom and practice of formulating and executing sales representative agreements in the automotive industry. He has worked in that industry in a manufacturer's representative agency for almost two decades and has negotiated and reviewed dozens of agreements.

The defendant's main argument is that Barr's opinions are neither relevant nor reliable, because he relied only on the pleadings in this case and conversations with an unknown number of sales representatives and family friends at unknown times; he did not draft, review, or rely upon any industry surveys, statistics, or industry data to support his opinion; he does not know how many suppliers he has spoken with regarding life-of-the-part agreements; and he does not know how many times in his career that post-termination commissions were imposed on a manufacturer in the absence of an oral or written agreement.

Expert testimony is governed by Evidence Rule 702, which was modified in December 2000 to reflect the Supreme Court's emphasis in *Daubert v. Merrell Dow Pharmaceuticals., Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), on the trial court's gate-keeping obligation to conduct a preliminary assessment of relevance and reliability whenever a witness testifies to an opinion based on specialized knowledge. Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

The language added by the 2000 amendment — subparagraphs (b) through (d) — restates *Daubert*'s insistence on the requirements that an expert's opinion be based on a foundation grounded in the actual facts of the case, that the opinion is valid according to the discipline that furnished the base of special knowledge, and that the expert appropriately "fits" the facts of the case into the theories and methods he or she espouses. *See Daubert*, 509 U.S. at 591-93.

An expert's opinion is not relevant unless it is based on the actual facts of the case. *Lee v. Smith & Wesson Corp.*, 760 F.3d 523, 529 (6th Cir. 2014) (Keith, J. dissenting) ("The "relevancy" prong of Rule 702 requires that an expert's theory adequately 'fit' the facts of the case. Expert testimony that does not fit the facts does not relate to an issue in the case and, therefore, is not relevant.") (citing *Daubert,* 509 U.S. at 591). An opinion is "reliable" from an evidentiary standpoint if it is "valid" according to the discipline upon which it is based. *See Daubert*, 509 U.S. at 590. In determining validity, the Court's focus is on principles and methodology, not results.

Other than his review of the pleadings in this case, Barr's opinion that the plaintiff is entitled to post-termination commissions is based strictly on his general understanding of the customs in the automotive parts industry. He has not explained how the parties' relationship fit that general understanding or why the arrangement ought to be viewed as typical of his conception of the customary arrangement for payment of post-termination commissions. There is no indication that he took into consideration the nature of the relationship, when the oral agreement was formed, the types of parts involved to determine whether the life cycle of the particular parts was long or short, or any other facts specific to this case. Barr's opinion that the plaintiff is entitled to post-termination commissions is based on the bare-bones assumptions that the parties' entered into an oral agreement to sell parts, and that it dealt with the automotive parts industry. Barr's conclusions could apply to

any automotive parts dispute case in any court. Because his opinion that the plaintiff should win his commission claim is not grounded in the actual facts of this case, it does not satisfy the foundational requirements of Rule 702.

The defendant also argues that the opinion is flawed because it embraces ultimate issue in the case. That alone, of course, would not render it inadmissible. *See* Fed. R. Evid. 704(a) ("An opinion is not objectionable just because it embraces an ultimate issue."). But Barr's opinion amounts to a legal conclusion, and "a witness may not testify to a legal conclusion." *Hyland v. HomeServices of Am., Inc.*, 771 F.3d 310, 322 (6th Cir. 2014) (citing *Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994)). Expert testimony that "attempts to tell the jury what result to reach and which runs the risk of interfering with a district court's jury instructions, hardly can be viewed as being helpful to the jury." Exclusion of such testimony is appropriate "on the ground that it would not be helpful to the trier of fact." *Woods v. Lecureux*, 110 F.3d 1215, 1220 (6th Cir. 1997) (citing Fed. R. Evid. 702).

However, Barr does have useful — and admissible — information to offer. The 2000 Amendments to Rule 702 did "not alter the venerable practice of using expert testimony to educate the factfinder on general principles." Fed. R. Evid. 702 Advisory Committee Notes to 2000 Amendments. Rule 702 allows an expert to "testify in the form of an opinion *or otherwise*" (emphasis added), which means that the expert may share his or her special knowledge with the jury in areas that might extend beyond the information known to the average juror. *See, e.g., Redmond v. United States*, 194 F. Supp. 3d 606, 615 (E.D. Mich. 2016) (stating that an expert's testimony could be helpful to the jury if the information is "beyond the ken of common knowledge") (citing *Berry v. City of Detroit*, 25 F.3d 1342, 1350 (6th Cir.1994)).

Barr is qualified to testify about the customs and practices of manufacturers' representatives and their customers, including the practice of paying post-termination commissions throughout the production life of the part for which the representative is the procuring cause of the sales orders. *See Reed v. Kurdziel*, 352 Mich. 287, 293-94, 89 N.W.2d 479, 482 (1958) (validating life-of-the-part agreements, where there is evidence from which the trial court could conclude that the oral agreement between the parties did not have a time limitation, and the plaintiff was to receive commissions on original sales as well as reorders). When an expert's testimony does not take the form of an opinion, but rather focuses on "educat[ing] the factfinder on general principles," application of the foundational elements in Rule 702 takes on a different cast. Take *First Tennessee Bank National Association v. Barreto*, 268 F.3d 319 (6th Cir. 2001), for example. In that case, the expert witness described industry customs dealing with prudent banking practices. The court held that the *Daubert* factors were not helpful in determining the admissibility of an expert's testimony on whether the plaintiff followed such practices. It reasoned that because the basis of the expert's testimony was his "own practical experiences throughout forty years in the banking industry," his testimony was not the sort that "len[t] [it]sel[f] to scholarly review or to traditional scientific evaluation." *Id*. at 335.

Here, as in *Barreto*, Barr's proposed testimony on the general practices of the automotive parts industry is based on his years of experience and does not lend itself to scientific evaluation. Barr's opinions about industry practices and customs are not unreliable simply because they have not been "subjected to the crucible of peer review, or that their validity has not been confirmed through empirical analysis. . . ." *Barreto*, 268 F.3d at 334. Barr's explanation of the purpose and history of life-of-the-part agreements is thorough and well articulated. The defendant seems to

accept Barr's characterization of automotive part life cycles. The proposed testimony on the use of life-of-the-part agreements fits the facts of the case and would be helpful to the jury when deciding whether life-of-the-part provisions are implied in all automotive parts contracts, unless specified otherwise.

Barr may not give an opinion at trial that Jesa is entitled to pre- and post-termination commissions for the life of the part on the business that it procured for Thermoflex. But he may offer testimony on the customs and practices of manufacturers' representatives and their customers on the subject of paying post-termination commissions throughout the production life of the part for which the representative is the procuring cause of the sales orders.

B.

Defense proposed expert Roger E. Rickey's testimony suffers from similar faults and will be subject to the same limitations. Rickey, currently employed by DKM Industries, has submitted a report on "life of the part" agreements in the automotive parts industry. Rickey offered the following conclusions:

> It is well known and understood in the Automotive Industry that "life of the part" term is issued only by the OEM to the Manufacturer. The Manufacturer pays commissions to the Sales Representative "life of the part" only so long as the Sales Representative is employed by the Manufacturer.
>
> After reviewing the documents, the following practices of the parties are not consistent with an agreement to pay for "life of the part" or post commissions in the Automotive Industry:
>
> • No Formal written agreement was signed between the two parties
> • Reductions in commissions rates were not discussed
> • "Life of the part" commissions after termination of employment were not discussed
> • JESA accepted commissions on the parts that were "house accounts" at the time JESA was employed

- JESA received commissions on parts shipped to Mexico that JESA did not sell
- Making Mazda a house account was not discussed
- JESA made no objections either time commission rates were reduced

Based upon the assumptions above, my forty years' experience in the Automotive Industry, and my review of the documents listed above, it is my opinion that the Plaintiff IS NOT entitled to compensation after the termination of his employment by the Defendant Thermoflex Corp.

Pl.'s Mot. [dkt. #48], Ex. H, Report of Roger E. Rickey dated Nov. 9, 2016 at 3-4.

Rickey based his opinion on his review of the pleadings, the defendant's first set of interrogatories and the plaintiff's responses, the defendant's first set of requests to admit and the plaintiff's responses, Terrence Barr's expert report, e-mail communications discussing commission charges, the depositions and exhibits of Jesa personnel Robert Price and Robert Silagy, and his years of experience working in the automotive parts industry in a representative capacity.

Rickey has an associate degree in automotive technology and a bachelors degree in business administration. He has been a member of the Society of Automotive Engineers for 30 years. He began working for the Ford Motor Company in 1962 in various positions related to engineering. In 1980, he started working for United Technologies, a Tier I supplier of automotive electro-mechanical, wire harness, and electronics products, in its automotive products division, eventually as the chief engineer and director of engineering. He began working for Chrysler Corporation in 1985 as its plant manager in Huntsville, Alabama. In 1989, he formed R.E. Rickey & Associates, Inc., a management consulting corporation in Big Rapids, Michigan. From 2006 to 2009, Rickey also worked for Amertek Corporation where he says he received new business awards from seven companies. Rickey also co-authored *Robustness Validation Handbook* published by the Society of

Engineers in 2007 and *World Automotive Connector Market* published by Bishop & Associates, Inc. It is not clear whether these publications address the issues in this case.

Rickey testified at his deposition that over the course of his career, he has reviewed approximately 100 sales representative agreements for various manufacturers and continues to negotiate and enter into sales representative agreements in connection with his own company. He testified that he has never negotiated payment of commissions after termination because he did not think it was the "moral thing to do." He clarified that he believes that he should be paid "for the day's work that [he] works." Pl.'s Response, Ex. D. Rickey dep. at 69-70. When plaintiff's counsel pushed back on his position and offered a number of hypothetical situations that may call into question his moral objection to post-termination commissions, Rickey equivocated.

Rickey, like the other proposed expert witnesses, has significant and relevant experience in the automotive industry. The plaintiff argues that he largely used "form" sales representative agreements and therefore he did not negotiate the agreements he reviewed or entered into. However, that also may be the practice within the automotive industry. It may be common to use standardized representative agreements. And such agreements may migrate when professionals, such as Rickey, take new positions or form their own sales representative firms. Rickey's testimony is not unreliable simply because manufacturers have a practice of using form agreements.

The plaintiff also argues that Rickey demonstrates his lack of experience when he said that he had never heard of post-termination commissions in sales representative agreements. That Rickey's experience level differs from Barr's is no basis to render him unqualified on the subject. As is generally observed in such cases, that feature goes to the weight of Rickey's testimony rather than its admissibility. The plaintiff also attacks Rickey's "moral" position on post-termination

commissions. That testimony is irrelevant and would not help the factfinder determine an issue in this case.

Rickey is qualified to testify to industry custom and practice, which would include his understanding of paying post-termination commissions. But his opinion that Jesa is not "entitled to compensation after the termination of his employment by . . . Thermoflex" amounts to a legal conclusion. For the reasons discussed above, Rickey — like Barr — may not share that opinion with the jury. *Woods*, 110 F.3d at 1220.

C.

Donald E. Rose appears to be Rickey's boss at DKM Industries. Not surprisingly, his report on "life of the part" agreements in the automotive parts industry parallels Rickey's observations. It is not clear why both witnesses are necessary. Nonetheless, Rose offered the following conclusions:

> c. In my experience, agreements by a manufacturer to pay a Manufacturer Representative subsequent to termination of the Manufacturer Representative agreement for life of any parts whose sale the Manufacturer Representative procured prior to termination (sometimes referred to as "Life of Part Manufacturer Representative Agreements") are not standard in the industry, nor are the terms of any such Life of Part Manufacturer Representative Agreements standard in the industry.
>
> d. To the contrary, in my experience in the industry, Life of Part Manufacturer Representative Agreements are always individually negotiated and reduced to writing, so that there is no misunderstanding later if the Agreement is terminated. Indeed, during more than 43 years working in the industry, I have never heard of an oral Life of Part Manufacturer Representative Agreement like the one Jesa is asserting existed.
>
> e. Additionally, in my experience written Life of Part Manufacturer Representative Agreements are typically found in the industry only when the Manufacturer Representative does all or almost all the engineering work and has its own engineering staff.

      f.      Also, in my experience, written Life of Part Manufacturer Representative Agreements that are used in the industry typically include reduced commission percentages because the Customer wants lower pricing over the life of part. Again, the amount and duration of these reduced commissions is addressed in the written Life of Part Manufacturer Representative Agreement.

      g.      Life of Part agreements is so important that it is an established practice to describe in detail in all contract negotiations. The practice of the parties is not consistent with Life of Part payment agreement. Jesa received paid commissions from a previous sales representative. Jesa was paid commissions on parts that he was not involved in procuring the business. Jesa had no objection to reduced commissions. Jesa had no objection to any house accounts not being paid a commission.

      h.      Finally, in my experience in the industry, written Life of Part Manufacturer Representative Agreements usually include agreements to pay post-termination commissions for only a finite period (from 30 days on up) and typically on a diminishing scale (from 50% on down), but again, only if the contract is in writing so that there is no misunderstanding.

Pl.s' Mot. to Strike Expert Witness, Ex. G, Rose Report.

Notably, Rose does not intend to offer an opinion on whether Jesa is entitled to the commission it seeks in this case.

Rose based his opinion on his review of the pleadings, the defendant's first set of interrogatories and the plaintiff's responses, the defendant's first set of requests to admit and the plaintiff's responses, Terrence Barr's expert report, e-mail communications regarding commission charges, the depositions of Robert Price and Robert Silagy, and his years of experience working in the automotive parts industry in a representative capacity.

From 1959 through 1966, Rose began working for the Midwest Rubber Company, an automotive supplier of rubber products as both an engineer and an inside sale representative. In 1966, he began working for Huron Tool in engineering, purchasing, and inside sales. In 1973, Rose began D.E. Rose & Associates, which later became DKM Industries, LLC when Rose brought in

-13-

his daughter, Kim, and his son, Mike, into the business. Rose has over 43 years experience as a commissioned sales representative and has been engaged as an expert witness in other cases.

The plaintiff argues that Rose is not qualified to testify as an expert witness in this case because he has no experience with *oral* sales representative agreements in the automotive industry. Rose admitted that he had no personal experience dealing with oral sales representative agreements, and he has never talked to anybody in the automotive industry about oral sales representative agreements. The plaintiff argues that because Rose has very little experience negotiating sales representative agreements and no experience negotiating *oral* sales representative agreements, he is not qualified to be an expert witness in this case.

The defendant argues that whether Rose has experience with oral agreements is beside the point. It asserts that there is no dispute that there was no agreement, written or otherwise, for post-termination commissions between the parties. The defendant argues that the issue is what happens when there is no express agreement for post-termination commissions, and Rose does not need to be an expert on oral contracts to offer his view of industry custom and practice on that issue. The defendant argues that Rose's proposed testimony refutes Barr's testimony that it is well known and understood in the industry that life-of-the-part provisions are implied in automotive parts agreements.

The defendant has the better argument.

The plaintiff's argument — limited to Rose's qualifications as an expert witness — is difficult to defend in light of Rose's four decades of experience as a sales representative in the automotive parts industry. The argument that he has no experience with oral contracts in the automotive industry misses the mark. The relevant question is what are the standard practices and

customs in the automotive parts industry for life-of-the-part agreements and post-termination commissions, regardless whether the contract was written or oral. Rose says that in his experience, representative agreements are always negotiated and reduced to writing so that there is no misunderstanding at some later date if the agreement is terminated. The plaintiff points out that Rose filed a verified complaint in another case that alleged otherwise, and that at his deposition he conceded that he had no experience with oral contracts. That does not render him unqualified, however, to testify. As the defendant notes, those matters are best reserved for "[v]igorous cross-examination" and "presentation of contrary evidence" to the jury. *Daubert*, 509 U.S. at 595.

III.

The proposed expert witnesses are qualified to testify about the customs and practices in the automotive parts industry on the payment of post-termination commissions. They may not render opinions of whether or not the plaintiff ought to recover the commissions it seeks in this case.

Accordingly, it is **ORDERED** that the motions to strike the testimony of expert witnesses [dkt. #48, 61, 95] are **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that witnesses Terrence A. Barr, Roger E. Rickey, and Donald E. Rose may offer evidence of the customs and practices of manufacturers' representatives and their customers on the subject of paying post-termination commissions throughout the production life of the part for which the representative is the procuring cause of the sales orders, but they may not render opinions on whether the plaintiff is entitled to pre- and post-termination commissions for the life of the part on the business that it procured for Thermoflex.

It is further **ORDERED** that the hearing on the defendant's second motion to strike the testimony of Terrence Barr [dkt. #95] presently scheduled for October 24, 2017 it **CANCELLED**.

s/David M. Lawson
                                        DAVID M. LAWSON
                                        United States District Judge

Dated: October 17, 2017

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on October 17, 2017.

                            s/Susan Pinkowski
                            SUSAN PINKOWSKI